IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

| | |
|---|---|
| JAMES RIVER EQUIPMENT, VIRGINIA, LLC, Plaintiff, | Civil Action |
| v. | No. 5:13-cv-28160 |
| JUSTICE ENERGY COMPANY, INC., Defendant. | Date: May 5, 2015 |

TRANSCRIPT OF MOTIONS HEARING HELD
BEFORE THE HONORABLE R. CLARKE VANDERVORT, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT
IN BECKLEY, WEST VIRGINIA

APPEARANCES:

For the Plaintiff: JASON S. HAMMOND, ESQ.
Bailey & Wyant
P. O. Box 3710
Charleston, WV 25337-3710

For the Defendant: No appearance

Court Reporter: Ayme Cochran, RMR, CRR

Proceedings recorded by Courtflow;
transcript produced by computer.

PROCEEDINGS had before The Honorable R. Clarke VanDervort, Magistrate Judge, United States District Court, Southern District of West Virginia, in Beckley, West Virginia, on May 5, 2015, at 1:32 p.m., as follows:

THE COURT: Good afternoon.

MR. HAMMOND: Good afternoon, Your Honor.

THE COURT: This is the matter of James River Equipment, Virginia, LLC versus Justice Energy Company, Inc., civil action number 5:13-28160.

The Court notes in attendance Mr. Jason Hammond here in behalf of James River Equipment and notes no attendance of anyone in representation of Justice Energy Company.

Jason, what do we do, at this point, in your view?

MR. HAMMOND: In my view, Your Honor, I think they've shown nothing but contempt for Your Honor, and for myself, and my client, and these proceedings. I mean, there's obviously civil contempt, but there's also criminal contempt that's available to Your Honor, as well, to, I believe, have the U. S. Marshals pick up Mr. Semenov, or a representative of Justice Energy --

THE COURT: Uh-huh.

MR. HAMMOND: -- in order to attend this hearing and explain to us their absence and failure to pay.

THE COURT: Who are the representatives? Who is the President? I have this guy, William Morris Potter.

MR. HAMMOND: Yes. That's the name I saw on the Secretary of State's website, as well, and I believe that is a new addition whenever the purchase came about with the Justice -- whichever Justice entity --

THE COURT: All right.

MR. HAMMOND: -- on this. Roman Semenov, I know, is the General Counsel and agent for service of process as of today --

THE COURT: Uh-huh.

MR. HAMMOND: -- still on this, and that's who's been served with subpoenas, I believe, on four different occasions, at this point in time, to appear on this. But Mr. Potter, I believe, is the current President of the company.

THE COURT: I have no idea who he is.

MR. HAMMOND: I'm not familiar with him either, as well. I think I saw one of the officers, also, a Mr. Ball. I didn't bring the corporate --

THE COURT: Oh, okay. Now, is that -- that would be Mr. Stephen Ball?

MR. HAMMOND: I believe so. There's also --

THE COURT: And is this new?

MR. HAMMOND: No. I believe he's been there throughout.

THE COURT: Uh-huh. Uh-huh.

MR. HAMMOND: There was also -- back in November, when I met with Mr. Semenov, I also met with David Harrah, who is the Chief Financial Officer, as well, because he was the individual who was providing me copies of documents.

THE COURT: Uh-huh. Now, presumably, in any transaction that's occurred, which we have no evidence of, so far, all of the officers may have changed.

MR. HAMMOND: I know -- presumably, you're correct. The only one that I've noticed has not changed throughout the company --

THE COURT: Uh-huh.

MR. HAMMOND: -- has been Mr. Semenov, --

THE COURT: Uh-huh.

MR. HAMMOND: -- who appears to have stayed on with the company and, obviously, after we were last together, I think it was March 31st, Mr. Semenov had e-mailed me, I had attached that to my motion, and he still indicates that he's General Counsel of Bluestone Industries.

THE COURT: Uh-huh. All right. And he's in Washington, apparently, according to --

MR. HAMMOND: According to that e-mail.

THE COURT: Uh-huh.

MR. HAMMOND: But he gave me -- I think it was still a 304 telephone number. I don't know if it's something that patches through --

THE COURT: Uh-huh.

MR. HAMMOND: -- or how that is, but --

THE COURT: All right. Well, I agree with you totally that this is clearly condemnable conduct and I feel, at this point, that the penalties should be according -- whatever it is according to the law, but I feel, certainly, your client's attorneys' fees need to be paid. I feel that -- let me say, the process for my holding in contempt is one which I'm not so familiar with. I think we did it many years ago in another case and I'll need to re-visit all of that.

But what I -- in the first place, I find that this is contempt of the court proceedings, but my main concern is that we're prohibited from doing our jobs, Jason, of course, as you indicated in your initial statement, and that is attempting to recover the amount of the judgment. So, however we can accomplish this without -- you know, meaningfully -- without another hearing where we have no one sitting at opposing counsel's table, I really want to do.

It crosses my mind that we should have the next round of process be served personally by the United States Marshal Service and that these be subpoenas -- if we can do this legally, we have subpoenas issued for anyone who is in the management of Justice Energy Company, Inc. We'll have the United States Marshal Service serve those subpoenas, if we

can, and that would include Mr. Potter, Mr. Ball, and the other fellow who you named.

But I did get on the Secretary of State's web page yesterday just to see, plugging in Justice Energy Company, Inc., and the only thing that came up for me was "William Morris Potter" and, at that point then, I just did a Google search of that name and I got a lot of "William Morris's", who apparently are potters, and they -- you know, in which they make pots. Do you know what I mean?

MR. HAMMOND: Yes.

THE COURT: On a -- turn on -- ceramic pots. So, I was unsuccessful at obtaining a residence or anything. I just couldn't -- and I didn't spend much time, Jason, but I couldn't break through that. I didn't know what else to put in.

I put "West Virginia", "William Morris Potter, West Virginia", and I think that's as far as I went.

MR. HAMMOND: Okay.

THE COURT: His address should be available -- I don't know if his address would be available at Secretary of State. Probably not.

MR. HAMMOND: I think -- not his personal address, but I think the Secretary of State does list the corporate address for him.

THE COURT: Uh-huh. Okay.

Well, if you'll -- if you can locate these individuals, just call in their addresses and so forth.

MR. HAMMOND: Okay.

THE COURT: We will prepare an order requiring all of them to be in attendance at that -- at another hearing, which is convenient to you, and we'll see to it that they have personal service. We should see to it that they have personal service of these documents and, in the meantime, we will be working on an order with respect to the contempt issue.

It may well be that -- although, a colleague of mine in the Northern District of West Virginia in a -- in a *Sunbeam* -- in the *Sunbeam* case, I think it was, published several opinions in the way of criminal contempt, levied some really dramatic penalties, and was reversed in every respect but, of course, he really doesn't care. You know, he was just out for -- he was just upset and --

MR. HAMMOND: Well, I'd say -- I would say we've made a pretty good record --

THE COURT: I'd say so.

MR. HAMMOND: -- of --

THE COURT: Well, yeah.

MR. HAMMOND: -- of this behavior.

THE COURT: Yes. Yes, you have. This is at least the third instance; am I right --

MR. HAMMOND: That is absolutely right.

THE COURT: -- where they have ignored these proceedings. So, I really want to get down to the -- get down to the roots, and let's not just have them here, but have them here with evidence of what this company has.

I've just had a fleeting thought. This may mean we have to get Mr. Justice here, if he's part of it.

MR. HAMMOND: Well, that's going through my head, as well.

THE COURT: If he is, I have no trouble.

MR. HAMMOND: He, and potentially his son, I think, is involved in it, as well.

THE COURT: Uh-huh. If they're -- now, if they are now the owners of this company. I don't know how we find that out. Of course, they should be named as officers in the company, I would think.

MR. HAMMOND: Right.

THE COURT: But how do we learn that?

MR. HAMMOND: I can spend some time on the Secretary of State website and see what I find out --

THE COURT: All right.

MR. HAMMOND: -- on that aspect. Like I say, I'm still trying to get the Purchase Agreement, or Debt Assumption Agreement, and it still -- it wasn't even showing up on New York Stock Exchange.

THE COURT: Well, that's interesting. So -- so there's SEC. Well, you know, I had a case where -- where I was -- I felt, just only felt, that I was being -- that I was not being told the truth about the amount of insurance coverage that a restaurant chain had in a wrongful death matter, a dram shop issue. So, I was noodling around while talking on the phone in my law office and I found out that that restaurant chain was owned by a holding company and -- and that holding company had a presence with the SEC and I -- and one thing led to another.

It made a very late night for me, but I managed to scrounge up a whole lot more insurance coverage just through those SEC filings. I wonder if that -- so you're thinking that might be a --

MR. HAMMOND: I've actually been through several of them trying to pull that up. You find the notice where the purchase occurred, but it just lists the purchases occurring between Jim Justice, or a company to be named by Jim Justice.

THE COURT: I see. Oh, my goodness.

MR. HAMMOND: It's very generic.

THE COURT: Uh-huh. Vague. Very vague.

All right, Jason. Well, we'll -- we'll -- yeah.

MR. HAMMOND: Would you like for me to go ahead and submit an attorney's fee petition to you? I can go

ahead and file that and I can file --

THE COURT: I think that would be very helpful to me. That would be very helpful.

MR. HAMMOND: All right.

THE COURT: I have a fair amount of research to do. You've provided some of the standards in your memorandum, which I appreciate very much. Obviously, you meet all of the elements for the imposition of a contempt ruling. And so, I'm going to go ahead and prepare a memorandum opinion and order in all of these respects.

MR. HAMMOND: Yes, Your Honor.

THE COURT: And -- but I definitely want to get down to what we're all here for, and that is recovering these funds.

MR. HAMMOND: Well, I do know of another case that was in a similar posture that they paid the settlement off two weeks ago.

THE COURT: Well, you know, I was wondering if you'd come in with some word about it, but no -- no word at all?

MR. HAMMOND: I know it was paid off because I've been in contact with the attorney and he sent me a copy of the settlement check.

THE COURT: Okay. All right. Well, that's good and, hopefully, it will resolve itself that way.

MR. HAMMOND: That's certainly my hope. That's a road I never thought I was going to have to walk.

THE COURT: Right. Well, we need to apply some pressure, and I think we can do that, as long as we have accurate information about who the principals of this company are, and we're not quite sure of that right yet.

MR. HAMMOND: Yes, and I can -- I can pull all that. I would be glad to send it to Mary Beth.

THE COURT: Okay, very good. Thank you, Jason.

MR. HAMMOND: Thank you. I appreciate your time.

THE COURT: I appreciate you, sir.

(Proceedings concluded at 1:47 p.m., May 5, 2015.)

CERTIFICATION:

I, Ayme A. Cochran, Official Court Reporter, certify that the foregoing is a correct transcript from the record of proceedings in the matter of James River Equipment, Virginia, LLC, Plaintiff v. Justice Energy Company, Inc., Defendant, Civil Action No. 5:13-cv-28160, as recorded on May 5, 2015.

s/Ayme A . Cochran, RMR, CRR September 20, 2016

Ayme A. Cochran, RMR, CRR DATE