# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
# AT BECKLEY

JAMES RIVER EQUIPMENT VIRGINIA, LLC,

    Plaintiff,

UNITED STATES OF AMERICA,

    Intervenor Plaintiff,

vs.                                       Civil Action No. 5:13-cv-28160

JUSTICE ENERGY COMPANY, INC.,

    Defendant.

**MEMORANDUM IN SUPPORT OF INTERVENOR UNITED STATES OF AMERICA'S MOTION TO IMPOSE LIABILITY ON THE ALTER EGOS OF DEFENDANT JUSTICE ENERGY COMPANY, INC.**

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Procedural Background

On January 5, 2016, this Court granted a motion to hold Defendant Justice Energy Company, Inc. ("JEC") in civil contempt and imposed a $30,000 per day sanction. (ECF No. 59.) The Court subsequently entered judgment in favor of the United States for a total civil contempt sanction of $1,230,000 on February 25, 2016. (ECF No. 67.) The judgment was affirmed on appeal in two separate decisions by the United States Court of Appeals for the Fourth Circuit. Defendant JEC did not seek review before the United States Supreme Court.

The United States moved to intervene as an interested party on January 31, 2019, to recover the civil contempt sanction, which was a debt owed to the United States. (ECF No. 115.) That motion was granted by the Court that same day. (ECF No. 116.) The United States has engaged in limited discovery related to JEC's assets. The United States has deposed Stephen Ball, Vice

President and General Counsel for JEC; James C. Justice III, President of JEC; and James Miller, Secretary and Treasurer of JEC. In addition, the United States has engaged in discovery regarding certain documents and records of JEC.

After the Court's entry of its most recent order on May 30, 2019, (ECF No. 124), counsel for the United States sent a letter to counsel for JEC to try to engage JEC and its counsel to enter into discussions to comply with that order. (See ECF No. 125-4, Exhibit D attached to the motion.) However, the United States and its counsel received no response from JEC and its counsel prior to the filing of the current motion before the Court.

After completing discovery, the United States has concluded that JEC was, and is, in reality, a shell corporation with no real independent and separate corporate existence. JEC has no substantive assets, has not engaged in true corporate activities, and is dominated and controlled by a limited liability company and certain corporations that are dominated and controlled by James C. Justice II and James C. Justice III ("the Justices"), the shareholders of the corporate entity that ultimately controls JEC. The limited liability company and related corporate entities, along with the Justices, are the alter egos for JEC and should be held accountable for the civil contempt sanction since they controlled JEC's actions leading to the sanction. The United States now seeks a ruling from the Court to allow it to impose liability upon and to seek recovery from these alter egos of JEC to pay the civil contempt sanction that the Court has assessed in this case.

**B.     Factual Background**

Before discussing the financial position of JEC, a summation of its corporate structure is informative. JEC is the subsidiary of JCJ Coal Group, LLC, which is owned by Blue Stone Mineral, Inc. (ECF No. 125-1 (Ball Dep.) at 12:17-22.) Blue Stone Mineral, Inc.'s parent company is Blue Stone Resources, Inc. ("Blue Stone Resources"), which is owned by the Justices

2

in their individual capacities. (Id. at 12:23–13:7.) JEC's business address is 302 South Jefferson Street in Roanoke, Virginia. (Id. at 22:6-8.) That is also the business address for Blue Stone Resources and several other coal companies owned by the Justices, including Southern Coal Corporation, Kentucky Fuel Corporation, A&G Coal Corporation, and Virginia Fuel Corporation. (Id. at 22:17-21.)

JEC's only officers are James C. Justice III, President; Stephen W. Ball, Vice President and General Counsel; and James T. Miller, Secretary and Treasurer. (Id. at 16:11–17:1.) Mr. Justice III "generally serves as the [p]resident of all of the companies," including Blue Stone Resources, Blue Stone Mineral, Inc., JCJ Coal Group, LLC, and James C. Justice Companies, LLC. (Id. at 17:2-18.) However, he admits that he is not involved in JEC's day-to-day business. (ECF No. 125-2 (Justice Dep.) at 8:13–9:7.) Mr. Miller is the secretary and/or treasurer of all those same entities although his role in the companies "is basically more or less ceremonial." (ECF No. 125-1 (Ball Dep.) at 18:1–19:8 (noting that while "[h]e's a long time employee for the Justice family and all of their other operations . . . he's not engaged in anything with Justice Energy on a day to day basis"); see also ECF No. 125-3 (Miller Dep.) at 8:21–9:5, 11:7-10 ("Q. And what about JCJ Coal Group, LLC? Do you have any . . . position with that company? A. I'm probably secretary treasurer but I can't say for sure.").) Mr. Miller's time is justifiably preoccupied in his role as Vice President of Operations for the Greenbrier Hotel Corporation, another Justice-owned company. (ECF No. 125-3 (Miller Dep.) at 9:10-16.)

JEC's only two directors are James C. Justice III and his sister Jillean Justice. (ECF No. 125-1 (Ball Dep.) at 32:10-13; see also ECF No. 125-2 (Justice Dep.) at 10:24–11:5.) Although these directors exist on paper, JEC does not conduct board meetings or maintain corporate minutes of any kind. (ECF No. 125-1 (Ball Dep.) at 34:9–35:3 (stating that "not necessarily Justice Energy

3

but the [Justice] family occasionally will have a board meeting but it's not common").) Rather, JEC conducts its board business through "agreements," which the directors sign "in lieu of meeting." (Id. ("Q. So they just basically sign a document that says more or less we had a meeting on paper?  A. Yes."); ECF No. 125-2 (Justice Dep.) at 10:6-14.)  Nevertheless, "any operational decisions today would solely be made by James C. Justice, III." (ECF No. 125-1 (Ball Dep.) at 73:20-24; ECF No. 125-2 (Justice Dep.) at 13:3-9 ("I guess I would have the ultimate decision making authority . . . .").)  JEC's board has never voted to pay any dividends, (ECF No. 125-1 (Ball Dep.) at 39:20-22), and any major financial decision related to JEC would be made personally by James C. Justice III.  (ECF No. 125-2 (Justice Dep.) at 13:20–14:1.)

The sole purpose of JEC is to operate the Red Fox Surface Mine ("Red Fox") in McDowell County, West Virginia.  (ECF No. 125-1 (Ball Dep.) at 11:6-17, 40:14-17.)  While JEC operates Red Fox, it does not own the mine.  (Id. at 11:18-19.)  In fact, JEC does not own any true real estate, (id. at 38:1-4), nor does it operate a corporate headquarters.  (Id. at 21:15–22:4, 37:8-12 (reiterating that JEC owns no office equipment or furniture).)  It also has not paid any property taxes on the mine site.  (Id. at 78:4-7.)  The Red Fox mining permit is in the name of Blue Stone Coal Corporation.  (Id. at 13:11-12.)  In turn, Blue Stone Coal Corporation is a subsidiary of Blue Stone Industries, Inc., which is owned by Blue Stone Mineral, Inc.  (Id. at 13:13-16.)  As explained above, Blue Stone Mineral, Inc. is controlled by Blue Stone Resources, which is owned by the Justices in their individual capacities.  (Id. at 12:23–13:7.)

Despite the fact that the Red Fox mining permit is held by Blue Stone Coal Corporation, the reserves are separately owned by an unrelated company known as Rowland Land Company. (Id. at 11:24–12:4, 13:11-12, 13:21-24 (noting that Rowland Land Company is a special purpose entity created to own the Red Fox coal reserves), 14:2-10.)  Red Fox's surface and, thus, the right

to use it is leased to an affiliate of JEC called James C. Justice Companies, LLC, of which Mr. Justice III serves as President. (Id. at 12:5-6, 13:18-21, 15:10-11; 17:2-18.) JEC also does not sell the coal mined at Red Fox; it is sold through an affiliate known as Blue Stone Coal Sales Corporation. (Id. at 25:18-20; see also id. at 38:16-18 ("Q. Does Justice Energy have any contracts to either sell coal or produce coal with anyone? A. No.").) Whether the remaining reserves at Red Fox are minable and, thus, profitable, according to the company's Vice President, is "questionable." (Id. at 41:19–42:3.)

While JEC owns some equipment at the Red Fox site, the company has not recently assessed any value to that equipment. (Id. at 76:4-7.) The equipment owned by JEC is essentially "scrap items" and unfit for use. (Id. at 76:11-24.) Any equipment actually used at Red Fox, with the exception of one item, is furnished exclusively by Blue Stone Resources. (Id. at 12:7-14, 15:13-21, 75:17-23 (recognizing that one item located at Red Fox is owned by Southern Coal, another Justice family company).) Mr. Ball noted that there are liens associated with Blue Stone Resources' credit facilities—such as loans relating to Blue Stone Resources' equipment used at Red Fox—that "could apply to Justice Energy." (Id. at 19:22–20:10.) Blue Stone Resources, again, is personally owned by the Justices. (Id. at 13:1-7.)

An overview of JEC's finances shows a similar pattern of relying on Blue Stone Resources and the Justices' other subsidiaries in an effort to eschew responsibility for maintaining its own accounts and payroll. For example, Blue Stone Resources supplies "all of the administrative payroll and financial services needed by [JEC]" as JEC "does not have any of its own employees who supply or perform these services." (Id. at 22:24–23:7.) The only JEC employees, totaling around thirty, work at Red Fox and include equipment operators paid by the hour. (Id. at 23:8-17, 24:1-4 (providing that JEC employs no engineers or other professional staff members), 32:19-22.)

5

The foremen are employees of Blue Stone Industries, Inc. (Id. at 23:22-23.) Further, JEC does not deposit its own funds into a payroll account. (Id. at 25:13-15.) This, however, comes with little surprise given that JEC operates at a deficit, relying on Blue Stone Resources to make up the shortfall and furnish necessary payroll funds. (Id. at 25:8-12, 26:1-3; see also id. at 30:24–31:13 (noting that JEC has ended every month at a deficit since Red Fox began operating in 2018).)

Tellingly, JEC does not even prepare and file its own state or federal tax returns. (Id. at 24:5-11.) Blue Stone Resources "files a consolidated tax return for itself and all of its subsidiaries." (Id. at 24:9-16 ("So there are no standalone tax returns for Justice Energy Company.").) JEC similarly relies on Blue Stone Resources for all of its insurance policies. (Id. at 33:20–34:8.) JEC maintains a single BB&T bank account—funded by Blue Stone Resources—but has no other bank accounts, foreign or domestic, and holds no investment accounts, stocks, or bonds of any kind. (Id. at 35:4–36:2 (noting that reclamation bonds JEC would otherwise hold are in the name of Blue Stone Coal Corporation).)

The unaudited balance sheets provided by JEC to the United States when it began assessing its ability to recover the contempt sanction show little to no available funds. For instance, the balance sheet for the period ending December 31, 2016, lists $18,000 under accounts receivable. (See id. at 91 (Exhibit 2).) When asked about this figure, Mr. Ball indicated that he thought it was "a mistake" and a "carryover from the prior year." (Id. 44:9-19.) The very next figure brought to Mr. Ball's attention was $905,164.20, apparently representing inventory and produced coal. (See id. at 91 (Exhibit 2).) However, Mr. Ball specified that the number represents the coal stockpile at Red Fox, most of which has been sold. (Id. at 44:21–45:7 ("[T]here's no more left really of that stockpile.").) Then, when asked about the balance sheet's "non-current assets, fixed assets" figure of $42,771,527.55, (see id. at 91 (Exhibit 2)), Mr. Ball responded that it "seemed incorrect" and

"too high for what Justice Energy does and was doing at the time." (Id. at 45:8-19.) He concluded "that number is incorrect" as well. (Id. at 46:2-7.)

According to JEC's Vice President and General Counsel, the "real reason why Justice Energy continues to operate" is due to a collective bargaining agreement between JEC and the United Mine Workers Association. (Id. at 33:10-15.) It certainly does not operate because it enjoys an abundance of profit. Rather, it merely acts as a shell or alter ego for the other companies controlled by the Justices. JEC owns no real estate and has signed no leases. (Id. at 36:14-19, 39:5-6 (providing that JEC enjoys no rental income).) It has no safety deposit boxes, certificates of deposit, or trust accounts of any kind. (Id. at 36:9-13, 38:7-9, 39:14-16.) The company possesses no credit cards, letters of credit, or any accounts receivable. (Id. at 36:20–37:5 (answering affirmatively that no one owes any debts to JEC).) As evidenced above, JEC needs none of these because it simply acts as an alter ego of Blue Stone Resources and the other affiliated companies that provide JEC its necessary resources and funds. Ultimately, power over Blue Stone Resources and its affiliates, including JEC, rests with the Justices. (ECF No. 125-2 (Justice Dep.) at 10:16-22.)

## II. THE LIMITED LIABILITY PROTECTION AFFORDED TO CORPORATE ENTITIES AND LIMITED LIABILITY COMPANIES CAN BE PIERCED OR DISREGARDED UNDER THE ALTER EGO PRINCIPLE OR THEORY OF LAW

Generally, a corporation protects its shareholders from personal liability for the debts and financial obligations of the corporation. A limited liability company ("LLC") likewise shields its members from personal liability for that entity's debts and financial obligations. See Sky Cable LLC v. DIRECTTV, Inc., 886 F.3d 375, 385 (4th Cir. 2018) [hereinafter Sky Cable]. However, as the Fourth Circuit has stated, that protection afforded shareholders of corporations and members of LLCs can be disregarded under certain circumstances:

7

> Nevertheless, courts have disregarded the legal distinction between a business entity and the individuals who hold ownership interests in that entity, if maintaining the distinction would "produce injustices or inequitable consequences." In such circumstances, a court may "pierce the veil" separating the entity and its constituent members and treat the entity and its members as identical. Importantly, similar circumstances warrant piercing the veil of both corporations and LLCs.

Sky Cable, 886 F.3d at 385 (citations omitted) (citing DeWitt Truck Brokers, Inc. v. W. Ray Fleming Fruit Co., 540 F.2d 681 (4th Cir. 1976) [hereinafter DeWitt] and NetJets Aviation, Inc. v. LHC Commc'ns, 537 F.3d 168 (2d Cir. 2008) [hereinafter NetJets]).

Such piercing of the limited liability protections afforded corporations and LLCs has been applied traditionally when the corporation or LLC is merely an "instrumentality" or "alter ego" of its shareholder or member. Sky Cable, 886 F.3d at 385. This remedy is often applied when to recognize the limited liability form "would cause fraud or similar injustice." Id. at 387. "'[T]he alter ego theory is a general principle of corporate law according to which a court may pierce a company's veil if separate entities 'operate[ ] as a single economic entity such that it would be inequitable for [the] Court to uphold a legal distinction between them.'" Sky Cable, 886 F.3d at 386–87 (quoting NetJets, 537 F.3d at 177). As the Fourth Circuit explained in the context of Delaware corporate and LLC law, a strong public policy is behind the alter ego principle:

> We also observe that "Delaware has a powerful interest of its own in preventing the entities that it charters from being used as vehicles for fraud. Delaware's legitimacy as a chartering jurisdiction depends on it." NACCO Indus., Inc. v. Applica Inc., 997 A.2d 1, 26 (Del. Ch. 2009). Were Delaware to permit courts to hold an alter ego member liable for an entity's debts without also allowing courts to hold the alter ego entity liable for the member's debts, fraudulent members could hide assets in plain sight to avoid paying a judgment. Delaware law is clear, however, that a corporate form cannot be used as a "shield" to hinder creditors from collecting on adjudicated claims. See Martin v. D.B. Martin Co., 88 A. 612, 614, 619 (Del. Ch. 1913); see also C.F. Trust, Inc. v. First Flight Ltd. P'ship, 306 F.3d 126, 135 (4th Cir. 2002) (noting that corporate form should not be used to "shelter" assets "from lawful claims of judgment creditors" (citation omitted)).

Sky Cable, 886 F.3d at 387.

To determine whether the alter ego principle should be applied, courts look at a number of factors: (1) a mingling of assets and operations of the entity and its owner(s); (2) a disregard of corporate formalities; (3) the fact that a single individual or entity dominates and controls another entity; (4) gross undercapitalization of the corporate entity; (5) non-payment of dividends; (6) insolvency of the debtor corporation; (7) siphoning of funds from the corporation to other entities; (8) non-functioning of officers or directors; (9) absence of separate corporate records; and (10) the fact that the corporation is merely a facade or shell for the operations of the dominant shareholder or other related entities. See Sky Cable, 886 F.3d at 389–91; DeWitt, 540 F.2d at 686–87; see also Connors v. Princeton Coal Grp., Inc., 770 F. Supp. 1132, 1138–39 (S.D. W. Va. 1991) (citing Keffer v. H.K. Porter Co., Inc., 872 F.2d 60, 65 (4th Cir. 1989)). Under the law, "piercing an entity's veil under the alter ego theory is particularly appropriate when a single individual or entity completely dominates and controls another entity." Sky Cable, 886 F.3d at 390 (citing Wallace ex rel. Cencom Cable Income Partners II, Inc. v. Wood, 752 A.2d 1175, 1183–84 (Del. Ch. 1999)). It is not necessary that the limited liability entity be created with a fraudulent purpose—it is enough that the limited liability entity is being used to create an injustice. Id.

**III. THE ALTER EGO THEORY OR PRINCIPLE OF LAW SHOULD BE APPLIED TO HOLD THE CORPORATIONS, LIMITED LIABILITY ENTITIES, AND THEIR OWNERS CONTROLLING JUSTICE ENERGY COMPANY, INC., LIABLE FOR THE CIVIL CONTEMPT SANCTION ASSESSED BY THE COURT IN THIS CASE**

There is no doubt that JEC was and is nothing more than a corporate shell dominated and controlled by James C. Justice II, James C. Justice III, and their business instrumentalities. JEC has no capital. As the extensive testimony of Stephen Ball detailed, (see generally ECF No. 125-1), JEC does not have any real substantive assets. JEC does not even own the Red Fox mine which it claims to be operating. The coal reserves are owned by other entities, as are the mining permits and the equipment used in its operations. While JEC purportedly leases the equipment from Blue

Stone Resources and Southern Coal, it makes no lease payments for that equipment. The few employees of JEC are actually paid by Blue Stone Resources, which funds the payroll account. The supervisors overseeing the operation are actually employees of Blue Stone Resources and are paid by that entity. The reclamation bonds for the mine are owned by Blue Stone Coal Corporation.

The coal mined from the Red Fox mine is actually sold by Blue Stone Coal Sales Corporation, and the revenues from those sales are taken by Blue Stone Resources, which funds JEC's operations. JEC has no contracts to sell or produce coal. JEC does not pay any dividends to anyone. (See ECF No. 125-1 (Ball Dep.) at 35, 37–39.)

James Miller is listed as the secretary-treasurer of JEC, but his position is basically "ceremonial." He has no involvement in any of the corporate or day-to-day activities of JEC (See id. at 18–19; ECF No. 125-3 (Miller Dep.) at 8–9.)

JEC does not file a separate income tax return. The tax returns for JEC are part of a consolidated tax return. There are no standalone tax returns for JEC. (ECF No. 125-1 (Ball Dep.) at 24.) The property tax returns include the little equipment owned by JEC, but those property tax returns also contain the equipment from other entities, which are comingled with those of JEC. (Id. at 59–72; see also id. at 113–290 (Exhibits 5 and 6).)

JEC does not hold meetings of stockholders or directors. JEC does not have any separate corporate minutes. Rather, JEC only uses an "agreement" in lieu of meetings. JEC does not have its own separate headquarters. The corporate address for JEC is the same as its "ultimate parent," Blue Stone Resources. (See ECF No. 125-1 (Ball Dep.) at 21–22, 34–35.)

Insurance for JEC's operations is not part of a separate policy. Rather, JEC's operations for insurance purposes are covered by a group policy issued to Blue Stone Resources. (Id. at 27, 34.)

JEC has a single bank account, which is used to pay its few employees, but that account is funded by Blue Stone Resources. JEC does not place any funds into that account. JEC has no other bank accounts, investment accounts, or foreign money accounts. (Id. at 25, 35.) JEC has no accounts receivable and no one owes any debts to JEC. (Id. at 37.)

Any overall operational decisions in JEC are made by James C. Justice II and James C. Justice III. They are the shareholders of the various companies which control and have involvement with JEC. (Id. at 73–74; ECF No. 125-2 (Justice Dep.) at 10, 13–14.)

As these facts establish, JEC has no real separate corporate existence. The corporation is dominated by James C. Justice II and James C. Justice III through their corporate and limited liability company entities. JEC owns virtually nothing, pays for virtually nothing, and diverts its revenues to other entities. It is just a shell through which other Justice coal entities operate as determined by the decisions of James C. Justice II and James C. Justice III. This is the classic situation where the alter ego theory is applied to impose liability on those entities and persons who control a shell corporation such as JEC. See Mayes v. Moore, 419 F. Supp. 2d 775, 781 (M.D.N.C. 2006) (citing Thomas v. Peacock, 39 F.3d 493, 504 (4th Cir. 1994), rev'd on other grounds, 516 U.S. 349 (1996)). In this situation, the alter egos should be obligated to pay the contempt sanction involved in this case since JEC does not have the funds or assets to pay the sanction. See Sky Cable, 886 F.3d at 389–91; DeWitt, 540 F.2d at 685–89.

As stated in Sky Cable, "a corporate form cannot be used as a 'shield' to hinder creditors from collecting on adjudicated claims." 886 F.3d at 387. That is precisely what the Justices and

11

their limited liability company and corporate entities through which they control JEC are trying to accomplish here. Cf. United States v. TDC Mgmt. Corp., 263 F. Supp. 3d 257, 271–72 (D.D.C. 2017) ("[I]t is fair to infer from the record that Monts was acting to keep funds out of TDC after the judgment in this case. . . . If the Court were now to decline to pierce the corporate veil, the government might never be able to collect the judgment, and Monts would be rewarded for what appears to be an effort to frustrate collection of the judgment."). Under these circumstances, the Court should place the liability for the civil contempt sanction on the alter egos of JEC. See Friend v. Remac Am., Inc., 924 F. Supp. 2d 692, 699 (N.D. W. Va. 2013) ("[D]ecisions to look beyond, inside and through corporate facades must be made case-by-case, with particular attention to factual details." (citation omitted)). They are using an essentially insolvent JEC as a corporate facade to hide behind to avoid the financial liability they created with their decisions which caused the civil contempt sanction. It would be fundamentally unfair to allow the Justices and their limited liability company and corporate entities through which they control JEC to escape the financial liability they created by hiding behind an essentially insolvent JEC. See Keffer, 872 F.2d at 65 (Fourth Circuit affirming decision that a parent corporation could not hide behind an insolvent corporation to escape financial liability for the decisions made by the parent which controlled and dominated that insolvent corporation).

## IV. CONCLUSION

James C. Justice II and James C. Justice III, through their corporate and limited liability company entities by which they exercised control over JEC, made the decisions leading to the civil contempt sanction imposed by this Court. JEC has no real assets and is nothing more than a shell corporation through which the Justices operate coal mining activities. The public policy purpose of the alter ego theory or principle is designed to prevent such a result and to place liability where

it squarely belongs—on the entities and persons who are controlling and dominating the corporate entity that is really a shell and is insolvent. See Sky Cable, 886 F.3d at 387–91; Keffer, 872 F.2d at 64-65; DeWitt, 540 F.2d at 685–89. Here, there is no doubt that JEC is not operating as a real corporate entity, has no real separate corporate existence, is undercapitalized, and is being operated using the assets of a limited liability company and other corporations ultimately controlled, directed, and owned by the Justices. The Justices have the ultimate decision-making authority over all of the activities of these entities, and their decisions led to the imposition of the civil contempt sanction imposed by the Court in this case. They are the alter egos of JEC and should be held accountable for the civil contempt sanction assessed against JEC. Otherwise, an injustice will be worked upon the Court. The Justices and their limited liability entities with real and substantive assets will be able to hide behind an insolvent shell corporation that they dominated and controlled through their decisions to create the situation that led to the civil contempt sanction imposed by the Court and yet escape financial liability for their actions. The alter ego principle was designed to prevent just that occurrence. Accordingly, the United States respectfully requests that this Court hold JEC's alter egos—the parent and controlling entities and their shareholder-owners (the Justices)—liable for the civil contempt sanction imposed on JEC in this case.

Respectfully submitted,

**UNITED STATES OF AMERICA,
Intervenor,**

**MICHAEL B. STUART
United States Attorney**

**s/Fred B. Westfall, Jr.**
Fred B. Westfall, Jr. (WV State Bar No. 3992)
Jason S. Bailey
Assistant United States Attorneys
United States Attorney's Office
P.O. Box 1713
Charleston, WV  25326
Phone: 304-345-2200
Fax: 304-347-5443
E-mail: fred.westfall@usdoj.gov
E-mail: jason.bailey2@usdoj.gov
*Counsel for Intervenor United States of America*